UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



**FILED**

NOV 2 6 2014

CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:14-CR-30051-RAL |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS** |
| CLYDE AQUALLO, | |
| Defendant. | |

## SUMMARY

In this firearms case, Clyde Aquallo seeks to suppress, on Fourth and Fifth Amendment as well as *Miranda* grounds, the rifles and shotguns seized from his live-in girlfriend's house, the pre- and post-arrest statements he made to tribal officers and the urine sample taken from him, including the test results for the same.  Because none of this evidence is excludable, the Court recommends Aquallo's suppression motion be denied.

## BACKGROUND

Shortly before 11:00 p.m. on February 27, 2014, Steve Burnette contacted the Rosebud Sioux Tribal Police Department to report his sister, Shari Burnette, was involved in a domestic dispute with her residential mate, Aquallo.  Sergeant William

Moran and Officer Daniel Reynolds, both tribal police officers, responded in separate cars and went to Miner's Trailer Court located three to four miles north of Rosebud, South Dakota. There, Sergeant Moran spoke with Steve on a gravel road. Steve said Shari's three children had shown up at his house "out of nowhere" because Aquallo had threatened to kill her. Additionally, Steve reported Shari and Aquallo were still at her house and Aquallo had firearms in the home. Sergeant Moran and Officer Reynolds then proceeded, down the same road, to Shari's residence. When they arrived, she was outside. She told Sergeant Moran (1) Aquallo had been "fighting with her; (2) she and her kids were "scared of him;" (3) she wanted him out of the house; (4) she was "worried about her kids and her house;" (5) she and her kids hated "having to walk around on egg shells in [their] own . . . house;" (6) she couldn't "take it anymore;" (7) he warned her "if the cops ever get involved, it would be really bad for [her];" and (8) he had "a lot of firearms inside the house."

While Sergeant Moran was outside with Shari, Officer Reynolds went into the residence and made contact with Aquallo in the kitchen. The two talked for approximately 15 minutes. During the conversation, Aquallo indicated he and Shari had argued about money and the children, him being unfaithful to her and Steve using methamphetamine.

In the meantime, Sergeant Moran traveled back to Steve's home and spoke to K.B., Shari's 14-year-old son. According to K.B., Aquallo had accused Shari of cheating on him, was "angry" and "threatened to kill her."

2

After returning, Sergeant Moran again talked to Shari, who was still outside the house and now standing behind an evergreen tree. When he informed her he planned to arrest Aquallo, Shari inquired how she was supposed to go about removing Aquallo's belongings from the home and spoke of being "worried about all those guns." After a minute or so, she expressed concern about "end[ing] up dead," saying "he's a scary guy." Following her plea to "[g]et me the hell out of here," she uttered, in a crying voice, "I don't think you realize how scared I am."

Before meeting with Shari a second time, Sergeant Moran had directed Officers Reynolds and Edwin Young (the latter who had since arrived at the house) to arrest Aquallo. They did, but Aquallo wanted to talk to Sergeant Moran about the arrest. Upon hearing this, Sergeant Moran ended his conversation with Shari and went into the home. There he informed Aquallo he was being arrested tribally for domestic abuse – putting Shari in "reasonable fear for her safety"[1] – and handcuffed him. Aquallo was cooperative and disclosed having several pocket knives on him.      Sergeant Moran removed the knives and placed them on the kitchen table.

Aquallo then indicated he needed his medication from a back bedroom and walked to the bedroom with Sergeant Moran. Inside, Aquallo pointed to a white plate, sitting under a television, with a baggie of marijuana, rolling papers and a scale on it

---

[1]*See* Law and Order Code of the Rosebud Sioux Tribe, Domestic Abuse (2012) (one who "purposely or knowingly causes apprehension of bodily injury in a . . . household member").

and declared the marijuana was Shari's, not his. Shari was later asked about this and agreed what was on the plate was her marijuana, but said she got it from Aquallo.

Officer Reynolds thereafter escorted Aquallo out of the residence and transported him to the Rosebud jail. Sergeant Moran and Officer Young stayed behind and collected the rifles and shotguns Shari wanted out of the house as well as the ammunition for them, the drug evidence and other items. In the process, Sergeant Moran noticed one of the shotguns appeared to have been illegally modified.

The next morning, Kenneth Ayers, a special agent with Rosebud Sioux Tribe Law Enforcement Services (RSTLES), sought and obtained a search warrant for Aquallo's urine. Later that same morning, Agent Ayers and Ben Estes, another special agent with RSTLES, interviewed Aquallo who was in custody at the time.  Aquallo was Mirandized, signed a written waiver and  interviewed. He admitted he and Shari had argued about money, but denied he had assaulted her – by physical contact, threats or even raising his voice. He said he did not use drugs and maintained Shari was the one who smoked marijuana, getting it from her brother Steve, her daughter and her ex-husband. He also said the short barreled shotgun found in Shari's home was not his. About 30 minutes into the interview, Aquallo was shown the search warrant Agent Ayers had obtained and provided a urine sample.

On October 15, 2014, a federal grand jury indicted Aquallo, charging him with possession of an unregistered firearm, being a prohibited person in possession of firearms, assault with a dangerous weapon and using and carrying a firearm during

4

and in relation to a crime of violence. He subsequently filed a motion seeking to suppress the guns from Shari's home, his statements before and after being arrested and the urine sample collected from him, arguing they were obtained in violation of the Fourth and Fifth Amendments and *Miranda*.[2] A hearing was held on the motion at which four witnesses testified and nine exhibits were admitted into evidence. Because the suppression motion is a dispositive one, this Court is only authorized the determine the same on a report and recommendation basis.[3]

## DISCUSSION

### A.    Seizure of the Firearms

Aquallo first claims the warrantless entry into Shari's residence and seizure of firearms inside it ran afoul of the Fourth Amendment. As he sees it, officers were required, but failed to obtain, a warrant before entering the house, arresting him on the tribal domestic abuse offense and commandeering the guns.

The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses, papers and effects against unreasonable searches and seizures."[4] "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to

---

[2]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]*See* 28 U.S.C. §636(b)(1).

[4]U.S. Const. amend. IV

the warrant requirement."[5]   One recognized exception is the voluntary consent of an individual possessing authority over the premises or effects to be searched.[6]   That person might be a homeowner,[7] or a fellow occupant who shares common authority over the property with another, absent, person.[8]  The exception even extends to entries and searches with the permission of a person the police reasonably, but erroneously, believe to possess shared authority as an occupant.[9]

While one resident's consent of a jointly occupied home is generally sufficient to justify a warrantless search, the Supreme Court created a narrow exception to this rule. According to the Court a "physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant."[10]  The Court though "went to great lengths to make clear that its holding

---

[5]*Riley v. California*, 134 S.Ct. 2473, 2482 (2014); *see also Payton v. New York*, 445 U.S. 573, 586 (1980); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971).

[6]*See Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

[7]*See Fernandez v. California*, 134 S.Ct. 1126, 1132 (2014); *Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973).

[8]*See United States v. Matlock*, 415 U.S. 164, 170 (1974).

[9]*See Rodriguez*, 497 U.S. at 186.

[10]*Randolph*, 547 U.S. at 122-23.

6

was limited to situations in which the objecting occupant is present."[11]   Hence, for

consent to be vitiated, the complaining occupant must be personally present unless

"there is evidence that the police have removed [him] from the entrance for the sake of

avoiding a possible objection."[12]

Consent may be express or implied.[13]   Implied consent is established when a

resident willingly allows, by words and action and without objection, officers to enter

her home to diffuse a dangerous situation.[14]   "There is no requirement that consent be in

_____

[11]*Fernandez*, 134 S.Ct. at 1133-34.

[12]*Id.* at 1134 (*quoting Randolph*, 547 U.S. at 121).

[13]*See United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008); *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006), *cert denied*, 549 U.S. 1259 (2007); *see also United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) ("An invitation or consent to enter a house may be implied as well as expressed.").

[14]*See United States v. Risner*, 593 F.3d 692, 694-95 (7th Cir. 2010); *United States v. Hylton*, 349 F.3d 781, 786-87 (4th Cir. 2003), *cert. denied*, 541 U.S. 1065 (2004); *see also United States v. Lopez-Carillo*, 536 Fed. Appx. 762, 769 (10th Cir. 2013) (agents reasonably believed defendant's mother gave implied consent or acquiesced to the entry and search of the home based on her gestures and conduct, including not stopping, limiting or objecting to the actions of police or answering their questions, retracting her consent or being uncooperative); *Williams*, 521 F.3d at 907 (where a motel occupant repeatedly told officers: "I wish you would go in there [Room 222] and get those guys."); *United States v. Alcorn*, 994 F.Supp.2d 769, 772-73, 777-78 (W.D. Va. 2014) (wife of defendant voluntarily provided implied consent for officers, responding to a disturbance call, to enter her apartment by swinging the door open and loudly accusing the individual inside of stealing her cell phone); *United States v. Walker*, Crim. No. 1:06-CR-446-TWT, 2007 WL 1341111 at *6 (N.D. Ga. May 1, 2007) (defendant's wife impliedly consented to the entry of her residence by telling agents that her husband was upstairs and they could talk to him and then allowing entry into the house); *State v. Flippo*, 212 W.Va. 560, 568-75, 575 S.E.2d 170, 178-88 (2002) (collecting cases and holding that where police are

(continued...)

response to an officer's request."[15]  "In fact, consent given without a specific request indicates voluntariness."[16]

Here, the precise question is not whether Shari consented subjectively, but whether her conduct would have caused a reasonable person to believe she consented to the entry and search of her residence.[17]  Crediting Sergeant Moran and Officers Reynolds and Young's testimony, the Court concludes Shari's actions would have engendered just such a belief.

Sergeant Moran and Officer Reynolds responded to a domestic disturbance call requesting assistance.  They were told Aquallo had threatened to kill Shari and there were firearms in the house.  Upon arrival, they found her outside the residence upset and almost crying.  She said she was scared of Aquallo and wanted him out of the house and reported there being "a lot of" firearms inside.  Faced with "an unpredictable" situation and wanting to avoid a "violent outcome" and something "bad" happening, Sergeant Moran stayed with Shari outside while Officer Reynolds entered the residence to check on what was going on inside.  In the end, Aquallo was

---

summoned to a dwelling and told that a crime was committed by someone on the premises, they had implied consent to enter and search inside, investigate the reported offense, identify the perpetrator and obtain evidence).

[15]*See Williams*, 521 F.3d at 907 (*citing Florida v. Royer*, 460 U.S. 491, 497 (1983)).

[16]*See Williams*, 521 F.3d at 907.

[17]*See id.; United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001).

8

arrested, with probable cause, and various items, including several firearms, were seized from the interior of the home.  At no time did Shari or, for that matter, Aquallo -- who was on the premises -- ever object, stop or interfere with what the officers were doing.

Given these circumstances, and the lack of any contrary indication from Aquallo, the officers had ample reason to believe they had implied -- but valid -- consent to enter and remove him from the house and to impound certain guns and drug evidence found inside.[18]  This being the case, the warrantless home entry, arrest, search and seizure did not contravene Fourth Amendment strictures and need not be suppressed.

**B.    Pre-Arrest Statements**

Aquallo next claims his pre-arrest statements to Officer Reynolds were elicited in violation of *Miranda*.   He contends he was detained and questioned, without any *Miranda* advisement.   The issue is whether he was in custody when he made his statements to the officer in the home.   If so, his statements must be suppressed because the officer gave Aquallo no *Miranda* warnings before the questioning.   If not, then Aquallo's statements are admissible as substantive evidence.

---

[18] *See Risner*, 593 F.3d at 694-95; *Lawrence v. Gwinnett County*, 557 Fed. Appx. 864, 871-72 & n. 9 (11th Cir. 2014); *United States v. Toyer*, 414 Fed. Appx. 584, 588-90 (4th Cir. 2011); *Hylton*, 349 F.3d at 786-87; *United States v. Stiner*, 551 F.Supp.2d 1350, 1353-55, 1357-58 (M.D. Fla. 2008).

The requirements of *Miranda* are triggered only when a suspect is both in custody and being interrogated.[19]  "Custody occurs when a suspect is deprived of his freedom of action in any significant manner."[20]  The "ultimate inquiry" in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[21]  "Two discrete inquiries are essential to [this] determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he [ ] was at liberty to terminate the interrogation and leave."[22]  In making these inquiries, a court must "look at the totality of the circumstances while keeping in mind that the [custody] determination is based 'on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officer[ ] or the person being questioned.'"[23]

---

[19]*See United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005), *cert. denied*, 547 U.S. 1082 (2006).

[20]*United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002).

[21]*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*) (*quoting California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*)), *cert. denied*, 543 U.S. 1145 (2005).

[22]*J.D.B. v. North* Carolina, 131 S.Ct. 2394, 2402 (2011) (*quoting Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

[23]*LeBrun*, 363 F.3d at 720 (*quoting Stansbury v. California*, 511 U.S. 318, 322-23 (1994)).

After due consideration of the circumstances present, the Court concludes Aquallo was not in "custody" within the meaning of *Miranda*. A number of factors support this conclusion. The interview occurred in the kitchen and living room areas of the home he lived in and was of short duration, lasting only 15 minutes. The tone was conversational -- no yelling or raised voices – and he sat calmly in a chair most of the time. In speaking with Aquallo, Officer Reynolds was engaged in on-the-scene fact-finding, trying to get Aquallo's side of a domestic squabble and figure out what had transpired. At no time during the interview was Aquallo handcuffed or physically restrained; instead, he was free to move about the house and did so. He voluntarily acquiesced to questions without hesitation, candidly making known he and Shari had been arguing over money, the children, infidelity and Steve consuming methamphetamine. Notably, he denied striking, much less, assaulting her and made no statements implicating himself in any criminal activity involving firearms, drugs or otherwise. No strong-arm tactics or deceptive stratagems were employed to get him to talk. Nor were any weapons ever brandished or displayed. The atmosphere was not police dominated, with Officer Reynolds largely being the only other person present, and there was no show of force. And it was another officer – one of Officer Reynolds's superiors – who eventually called for Aquallo's arrest and even then Aquallo was not manacled until sometime later on when Sergeant Moran returned to the residence and spoke with him inside (at his request) about the domestic abuse charge.

11

Having set the scene and reconstructed the players' lines and actions, the Court is convinced a reasonable person in Aquallo's shoes would not have understood he was in custody while briefly conversing with Officer Reynolds in the "comforts" of his own dwelling place.[24]   The officer, thus, was not required to warn Aquallo of his Fifth Amendment privilege against self-incrimination and his right to the assistance of counsel, as required by *Miranda*, before communicating with him.   Inasmuch as the precepts of *Miranda* were adhered to, Aquallo's attempt to suppress the pre-arrest statements he made to Officer Reynolds must fail.

## C.   Post-Arrest Statements

Agents Ayers and Estes interviewed Aquallo the following morning, February 28, at the jail.   After being Mirandized from a form and reading it, Aquallo was asked if he agreed with the "statement" in the waiver portion of the form.   He cryptically responded "to a certain extent."   Agent Ayers then said he thought the last of the

---

[24] *See Beckwith v. United States*, 425 U.S. 341, 346-48 & n.7 (1976); *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014); *United States v. Huether*, 673 F.3d 789, 794-95 (8th Cir. 2012); *United States v. Perrin*, 659 F.3d 718, 720-21 (8th Cir. 2011); *United States v. Czichray*, 378 F.3d 822, 827-30 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005); *Axsom*, 289 F.3d at 500-03; *see also Miranda*, 384 U.S. at 477-78 ("General on-the-scene questioning as to facts surrounding a crime or other questioning of citizens in the fact-finding process is not affected by our holding.   It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement.   In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present."); *see generally* 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure*, §6.6(e) (3d ed. 2007 & 2013-14 Supp.)

12

advisements on the form was "very important" and proceeded to reread the same out loud.[25]  When Aquallo inquired whether he should sign the form, waiving his rights, Agent Ayers replied, "If you'd like to answer questions, yeah."   Aquallo then said, "Sure," and signed the form.

Aquallo now claims he was misled into believing the advisement twice given to him – which he says is not even a *Miranda* right at all – was the most important advisement of them all.  And he alleges this admonishment was used coercively to get him to start talking, when he balked at answering questions and going ahead with the interview.

But in highlighting the advisement and rereading it to Aquallo, Agent Ayers was simply reminding Aquallo that if he decided to answer questions and not have a lawyer present – decisions he had to make in the first instance – he could stop answering (and be silent) at any time.  There was nothing unseemly, perfidious or oppressive about admonishing Aquallo he had these options available to him.

At any rate, the audio recording irrefutably shows Aquallo waived his right to remain silent.  First, he makes no assertion he did not understand his rights.  It therefore follows he knew what he gave up when he spoke.[26]  There is also more than enough

---

[25]*See* Mot. Hrg. Ex. 2 (Nov. 6, 2014) ("If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.")

[26] *See Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) (*citing Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

evidence in the record to independently conclude he understood his rights. He was read and acknowledged -- through his initials on the advice of rights form – understanding each of his rights and agreed to be questioned without a lawyer present.

Second, if Aquallo wanted to remain silent, he could have said nothing in response to Agents Ayers and Estes's questions, or he could have unambiguously invoked his Miranda rights and ended the interrogation.[27] The fact he chose not to and conversed with the agents for more than 30 minutes demonstrates a willingness to waive his rights.

Third, there is no evidence Aquallo's statements were coerced.[28] At no time did Agents Ayers and Estes ever threaten, promise, beguile, coax or force Aquallo to do anything. Nor did the agents use physical punishment, threats, deception, or trickery to get Aquallo to talk. He had a tenth grade education and could read, write and understand the English language. As a prior convicted felon, he also was no stranger to the criminal justice system. And he was not under the influence of alcohol or drugs while with the agents and nothing he said or did intimated he suffered from any form of mental incapacity, was low functioning or particularly suggestive and vulnerable to questioning by authority figures.

---

[27] See Berghuis, 560 U.S. at 386.

[28] See id. (citing Burbine, 475 U.S. at 421).

14

This is not one of those "rare" instances in which a suspect, after being properly warned, failed to make an open and autonomous decision to speak with probing agents and incriminate himself.[29]   In the final analysis, Aquallo was neither deluded nor intimidated, but rather made voluntary statements after a valid waiver of his *Miranda* rights, including his right to remain silent.[30]

## D.    Search Warrant

Aquallo lastly claims the urine sample taken from him, as well as the results of the tests conducted on it, should be suppressed because the search warrant for the sample was based on tainted evidence and lacked probable cause.  He says:

1.  He was arrested in violation of his constitutional rights;

2.  The search for and seizure of firearms and drug evidence in the house were unlawful;

3.  The warrant affidavit contained an inaccurate statement about "death threats;" and

---

[29]*See Dickerson v. United States*, 530 U.S. 428, 444 (2000).

[30]*See Berghuis*, 560 U.S. 370, at 382-89; *United States v. Morgan*, 729 F.3d 1086, 1092 (8th Cir. 2013); *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir.), *cert. denied*, 132 S.Ct. 213 (2011); *United States v. Abernathy*, CR. 11-30042-RAL, 2011 WL 5403244 at *5 (D.S.D. Aug. 15, 2011), *report and recommendation adopted*, 2011 WL 5403223 (D.S.D. Nov. 8, 2011); *see also United States v. Plugh*, 648 F.3d 118, 127-28 (2d Cir. 2011) (defendant knowingly and voluntarily waived his rights to remain silent and to consult with counsel both expressly and through a course of conduct indicating waiver), *cert. denied*, 132 S.Ct. 1610 (2012); *United States v. Oliver*, 630 F.3d 397, 409-10 (5th Cir.) (waiver of suspect's Fifth Amendment rights could clearly be inferred from his words and actions), *cert. denied*, 132 S.Ct. 758 (2011).

4.  The warrant was issued without probable cause.

The Court disagrees.

## 1.  Tainted Evidence

Officers had Shari's consent to enter the residence and probable cause to arrest Aquallo tribally for domestic abuse.  The search, seizure and removal of the firearms were likewise conducted with her consent and, indeed, at her request.  The marijuana and drug evidence were properly found in plain view and taken without encroaching upon the Fourth Amendment.[31]   And the "death threat" statement in the warrant affidavit was neither fallacious nor untrue given K.B.'s report Aquallo had "threatened to kill" Shari.

## 2.  Probable Cause

Before a search warrant may be issued, the Fourth Amendment requires a showing of probable cause.[32]  "Probable cause" is a "fair probability that contraband or evidence of a crime will be found in a particular place."[33]   In determining whether

---

[31]*See Washington v. Chrisman*, 455 U.S. 1, 6-9 (1982); *United States v. Varner*, 481 F.3d 569, 571-73 (8th Cir. 2007); *United States v. Khabeer*, 410 F.3d 477, 482 (8th Cir. 2005); *see also United States v. Reid*, 769 F.3d 990, 993 (8th Cir. 2014) (officers permissibly accompanied the homeowner to her bedroom where one of them observed and lawfully seized an assault rifle in plain view.)

[32]*See United* States *v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007).

[33]*Illinois v.* Gates, 462 U.S. 213, 238 (1983).

16

probable cause exists, a court must look at the totality of the circumstances.[34]  This determination is to be "based upon a common-sense reading of the entire affidavit"[35] and any "reasonable inferences" drawn therefrom.[36]  The assessment of probable cause is made "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the [ ] case."[37]  As the name itself suggests, "probable cause is a practical, factual, and non-technical concept, dealing with probabilities" and should be applied with this in mind.[38]

Once probable cause is found to issue a warrant, that finding is to be given great deference by a reviewing court.[39]  The court's duty is simply to ensure the issuing judge had a "substantial basis for . . . conclud[ing] that [the] search would uncover evidence of wrongdoing."[40]  "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or

---

[34]*See id.* at 230, 234.

[35]*United States v. Seidel*, 677 F.3d 334, 338 (8th Cir. 2012) (*quoting United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir. 1982)).

[36]*United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008).

[37]*Seidel*, 677 F.3d at 337 (*citing United States v. Reinholz*, 245 F.3d 765, 776 (8th Cir.), *cert. denied*, 534 U.S. 896 (2001)).

[38]*Seidel*, 677 F.3d at 337-38.

[39]*See Gates*, 462 U.S. at 236.

[40]*Id.* (*quoting Jones v. United States*, 362 U.S. 257, 271 (1960)).

marginal cases . . . should be largely determined by the preference to be accorded to warrants."[41]

Agent Ayers's affidavit, when examined in its totality and tested in a common-sense way, provided sufficient probable cause for a warrant to collect and test Aquallo's urine. The affidavit established a fair probability Aquallo was involved in drug activity and he and Shari used or at least possessed marijuana.

Following his arrest, Aquallo asked to retrieve his medication from a rear bedroom of the home he and Shari cohabitated in. He then proceeded to the bedroom and alerted Sergeant Moran to a plate with a baggie of marijuana, rolling papers and a scale on it and told him, "This is her marijuana." Shari acknowledged the marijuana was hers, but said she got it from Aquallo. Now, Aquallo had been previously convicted of a felony possession of marijuana with intent to distribute offense in state court. Although admittedly close to the edge, this information, together with the inferences drawn from it, was enough to demonstrate Aquallo and Shari were confederates in the use and possession of marijuana and dealings related to the same. Probable cause therefore existed – albeit by a thin margin – to issue a search warrant for Aquallo's urine.

---

[41]*United States v. Ventresca*, 380 U.S. 102, 109 (1965) (citation omitted).

3.    **Good Faith**

But even if the probable cause showing was too skimpy for purposes of the Fourth Amendment, the search of the residence and the seizure of the firearms from it must nevertheless be upheld. The basis for doing so is the "good faith" exception to the warrant requirement announced in *United States v. Leon*.[42]

In *Leon*, the Supreme Court created a good-faith exception to the Fourth Amendment exclusionary rule.[43] Under this exception, the rule is not to "be applied to exclude the use of evidence obtained by [ ] officers acting in reasonable reliance on a detached and neutral [ ] judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid."[44]

The rationale behind the exception is simple.    It is the issuing judge's responsibility to ascertain whether probable cause exists and if so, to issue a warrant that complies with the dictates of the Fourth Amendment. Ordinarily, an officer cannot be expected to question or second guess a judge's probable-cause determination or the technical sufficiency of the warrant itself.  "[O]nce the warrant issues, there is literally

---

[42]468 U.S. 897 (1984).

[43]*See id*. at 922.

[44]*United States v. Taylor*, 119 F.3d 625, 629 (8th Cir.) (*citing Leon*, 468 U.S. at 922-23), *cert. denied*, 522 U.S. 962 (1997).

nothing more the [officer] can do in seeking to comply with the law."[45] Penalizing the officer for the judge's errors, rather than the officers, does not deter Fourth Amendment violations.[46]

The *Leon* exception does not exclude evidence when an officer's reliance on a judge-issued warrant is objectively reasonable.[47]   Suppression though remains an appropriate remedy if the judge issuing the warrant is misled by information in an affidavit the affiant knows is false or is made with reckless disregard for the truth.[48] The exception likewise does not apply in cases where the issuing judge truly abandons his judicial role because in such circumstances, no reasonable well-trained officer can rely on the warrant.[49]  Nor can an officer manifest objective good faith in relying on a warrant supported by an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[50]   And depending on the

---

[45]*Leon*, 468 U.S. at 921.

[46]*See id.* at 916, 921.

[47]*See id.* at 922; *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984); *United States v. Moya*, 690 F.3d 944, 948 (8th Cir. 2012).

[48]*See Leon*, 468 U.S. at 923 (*citing Franks v. Delaware*, 438 U.S. 154 (1978)).

[49]*See Leon*, 468 U.S. at 923 (*citing Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979)).

[50]*Leon*, 468 U.S. at 923 (*quoting Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)).

circumstances of the case, a warrant may be so facially deficient that the executing officers cannot reasonably presume it to be valid.[51]

None of these disqualifying conditions precedent are present in this case. Nothing Agent Ayers stated in his affidavit contains knowing, intentional or reckless falsities. Any assertions to the contrary have no basis in fact and are not legitimized by the record.

There is also no evidence the issuing judge failed to act in a neutral and detached manner or that he was a mere "rubberstamp" or "adjunct law enforcement officer."[52] Nor is there evidence to suggest the judge was somehow involved in the "competitive enterprise of ferreting out crime"[53] or he blindly approved the search warrant.[54]

Although the legal sufficiency of the warrant affidavit is perhaps a debatable question, the Court cannot conclude the warrant was completely devoid of probable cause and thus could not be reasonably relied on as a basis for securing a urine sample

---

[51] *See Leon,* 468 U.S. at 923; *see also Sheppard,* 468 U.S. at 988-91.

[52]*See and compare with Lo-Ji Sales,* 442 U.S. at 326-27; *see also United States v. Martin,* 297 F.3d 1308, 1316-18 (11th Cir.) (discussing judicial abandonment under *Leon), cert. denied,* 537 U.S. 1076 (2002).

[53]*See Johnson v. United States,* 333 U.S. 10, 14 (1948).

[54]*See and compare with United States v. Swift,* 720 F.Supp.2d 1048, 1058-59 (E.D. Ark. 2010) (suppressing evidence where a blanket affidavit contained boilerplate language allowing car searches at a house, no probable cause to search cars existed, and the judge signed the warrant "without question or hesitation").

from Aquallo and testing it to determine whether he had marijuana or other drugs in his system. Granted, the judge should have been more demanding of Agent Ayers, made further inquiries of him and required more facts before approving the warrant. The judge though did not fail to manifest the neutrality and detachment required of a judicial officer or ratify a warrant application bereft of probable cause, perfunctory or "bare bones."[55]

Finally, Agent Ayers's reliance on the search warrant was in good faith and objectionably reasonable. He understandably believed he had a valid warrant, or at least court approved authority to take a urine sample from Aquallo. Agent Ayers certainly could and should have provided more information to enrich the probable cause showing in his warrant application. But under the circumstances, a reasonably well-trained officer in his position would not have known the urine draw was illegal after a judge had authorized it.[56]

---

[55]*See Leon*, 468 U.S. at 915, 925; *see also and compare with Aguilar v. Texas*, 378 U.S. 108, 109 (1964); *Giordenello v. United States*, 357 U.S. 480, 481 (1958); *Nathanson v. United States*, 290 U.S. 41, 44, 46-47 (1933).

[56]*See Leon*, 468 U.S. at 922, n. 23; *see also Moya*, 690 F.3d at 948-49; *United States v. Darr*, 661 F.3d 375, 378-80 (8th Cir. 2011), *cert. denied*, 133 S.Ct. 211 (2012); *United States v. Hudspeth*, 525 F.3d 667, 676 (8th Cir. 2008); *United States v. Carpenter*, 341 F.3d 666, 671-72 (8th Cir. 2003); *United States v. Hallam*, 407 F.3d 942, 945-47 (8th Cir. 2005); *Walden v. Carmach*, 156 F.3d 861, 871-72 (8th Cir. 1998); *United States v. Sager*, 743 F.2d 1261, 1266 (8th Cir. 1984), *cert. denied*, 469 U.S. 1217 (1985).

It is important to remember the Constitution protects persons, not by giving them a license to debate the police over the validity of a warrant, but by interposing the "deliberate, impartial judgment of a judicial officer . . . between [themselves] and the police"[57] and by providing a right to suppress evidence improperly obtained in a cause of action for damages. Aquallo received the benefit of a judge's impartial evaluation before any urine was drawn from him. The search and draw were arguably supported by enough probable cause to pass constitutional muster. Suppression of the urine sample and the results of the tests conducted on it, would be a remedy out of proportion to any Fourth Amendment transgression that may have occurred and is uncalled for in this case.[58]

## CONCLUSION

Shari impliedly consented to the officers entering her residence to arrest Aquallo and seize firearms from it. In fact, she insisted he and the guns be removed.

Aquallo was not in custody when he talked to Officer Reynolds in the home prior to being arrested. He was in familiar surroundings – the kitchen and living room of the house he lived in – and had not been arrested or subject to the restraints akin to a formal arrest.

---

[57]*Wong-Sun v. United States*, 371 U.S. 471, 481-82 (1963).

[58]*See Leon*, 468 U.S. at 918-20.

23

His post-arrest statements, at the jail the following day, were made in compliance with *Miranda*. He was advised of his rights and validly waived them without being misled or coerced.

Probable cause existed – just barely – for a search warrant to obtain a urine sample from Aquallo. Yet even assuming otherwise, the sample was taken based on an objectively reasonable (good-faith) belief the warrant, a judge found probable cause to issue, was valid.

Aquallo cannot succeed on his suppression motion. The firearms, his February 27 and 28 statements and the urine test results are all admissible in the Government's case-in-chief at trial.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Aquallo's Motion to Suppress[59] be denied in its entirety.

## NOTICE

An aggrieved party has 14 calendar days after service of this report and recommendation to file written objections to the same,[60] unless an extension of

---

[59]*See* Dkt. No. 33.

[60] *See* §636(b)(1); Fed. R. Civ. P. 72(b).

24

time for cause is obtained.[61]  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.[62]  Objections must "identify[ ] those issues on which further review is desired[.]"[63]

DATED this 26th day of November, 2014.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[61]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[62]*See Thompson*, 897 F.2d at 357; *Nash,* 781 at 667.

[63]*Arn*, 474 U.S. at 155.